# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2025

Lyle W. Cayce
Clerk

————————

No. 23-30827

————————

Baker Hughes Saudi Arabia Company Limited,

*Plaintiff—Appellee*,

*versus*

Dynamic Industries, Incorporated; Dynamic Industries
International, L.L.C.; Dynamic Industries
International Holdings, Incorporated,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CV-1396

———————————————————————

Before Clement, Graves, and Ramirez, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

In 2017, Baker Hughes Saudi Arabia Co., Ltd. (Baker Hughes) and Dynamic Industries Saudi Arabia, Ltd. (Dynamic) executed a subcontract in furtherance of an oil-and-gas project in Saudi Arabia. In it, they agreed to resolve via arbitration any disputes arising from the subcontract. Under Schedule A of the agreement, Dynamic could demand arbitration in Saudi Arabia. If Dynamic did not so demand, under Schedule E, either party could initiate arbitration under the rules of a separate forum: the Dubai

No. 23-30827

International Financial Centre's joint partnership with the London Court of International Arbitration, called the DIFC-LCIA Arbitration Centre (the DIFC-LCIA). The parties dispute whether Schedule E designates a forum and if so, which forum.

In 2021, the United Arab Emirates (UAE) abolished the DIFC-LCIA and created in its place a new arbitral institution that is functionally identical to its predecessor in many key respects. Later, a contract dispute arose, Baker Hughes sued in state court, and the case was removed to federal court. Dynamic moved to dismiss for *forum non conveniens* or alternatively to compel arbitration under Schedule E. The district court denied Dynamic's motion on the grounds that the parties' designated forum no longer existed, making the "forum-selection clause" unenforceable.

We hold that the district court erred by refusing to compel arbitration consistent with the terms of the subcontract. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion. We also GRANT IN PART and DENY IN PART Baker Hughes's motion to strike Dynamic's reply brief.

### I.

### A.

We recount the facts in three parts: (1) the creation of the DIFC-LCIA, (2) the execution of the subcontract, and (3) the dissolution of the DIFC-LCIA.

### 1.

In 2003, the UAE created its first "financial free zone" in Dubai, called the Dubai International Financial Centre (DIFC). Damien P. Horigan, *The New Adventures of the Common Law*, 5 Pace Int'l L. Rev. Online Companion 1, 7 (2009). Financial free zones in the UAE are autonomous

2

geographic sectors in which special rules and standards, separate from UAE law, govern financial and commercial activity. *See id.* at 8. Among the incentives for foreign parties to transact in the DIFC are the prospect of complete foreign corporate ownership, no corporate or income taxes for a guaranteed time period, no foreign exchange controls, and a special regulatory framework. *See id.* Consistent with this vision for financial free zones, the DIFC is an autonomous jurisdiction, empowered under UAE law to create its own legal and regulatory framework.

To that end, in 2008, the DIFC enacted new legislation governing arbitrations for which the DIFC is the designated seat (hereinafter, DIFC Arbitration Law). The "seat" of an arbitration sets the legal (not geographic) location of the arbitration. Gonzalo Vial, *Influence of the Arbitral Seat in the Outcome of an International Commercial Arbitration*, 50 INT'L LAW. 329, 332–33 (2017). The legal place of the proceedings "generally determines the *lex arbitri* and the courts with supervisory jurisdiction over the arbitration." *Id.* at 334 (internal quotations omitted). *Lex arbitri*, for its part, generally means

> (A) the recognition and enforcement of arbitral awards; (B) the courts with supervisory jurisdiction over the arbitration; (C) some procedural rules that could apply to the arbitration; (D) the costs of the procedure; (E) the way in which conflict of laws are solved; and (F) mandatory norms that could apply to the arbitration.

*Id.* at 335. The DIFC Arbitration Law—which remains in force to date—governs, *inter alia*, the recognition of arbitral agreements, the composition and jurisdiction of arbitral tribunals, the conduct of arbitral proceedings, the making of awards, and the recognition and enforcement of awards.

In February 2008, the DIFC teamed up with the London Court of International Arbitration (LCIA)—a century-old arbitral institution—to

create a new arbitral institution in the DIFC: the DIFC-LCIA. *See* Horigan, *supra*, at 15. After its inception, the DIFC-LCIA adopted a set of arbitral rules based upon those used by the LCIA. While those rules were in force, they governed the arbitral proceedings from the arbitration request through the issuance of an award and determination of costs.[1] Under the DIFC-LCIA rules, the LCIA would oversee the proceedings in certain respects, e.g., the functions of the registrar. The DIFC created the Dubai International Financial Centre Arbitration Institute (DAI) to work jointly with the LCIA to administer DIFC-LCIA arbitrations. But, under the DIFC-LCIA rules, "[t]he LCIA Court may decide to administer any arbitration directly, in whole or in part, if it deems this appropriate under the circumstances."

In short, the UAE created the DIFC, which in turn created its own laws governing arbitrations for which the DIFC is the designated seat, the DIFC Arbitration Law. The DIFC and the LCIA then (1) created the DIFC-LCIA and (2) adopted the DIFC-LCIA rules; and the DIFC created the DAI, which administered DIFC-LCIA arbitrations.

**2.**

In December 2017, Dynamic was slated to take part in an oil-and-gas project in Saudi Arabia as a contractor for Saudi Aramco. That month, Baker Hughes executed a subcontract with Dynamic, through which Baker Hughes agreed to supply materials, products, and services to Dynamic necessary to complete the project. The subcontract contains two provisions governing the dispute-resolution process. Those provisions interrelate as follows.

---

[1] The parties do not directly discuss how the DIFC-LCIA rules and the DIFC Arbitration Law would interrelate, i.e., whether they would conflict, in governing a hypothetical DIFC-seated arbitration under Schedule E.

No. 23-30827

Schedule A of the subcontract—both parties agree—empowers Dynamic to elect to arbitrate in Saudi Arabia any dispute arising out of the subcontract. Specifically, Section 20.4.5.3 of Schedule A provides as follows:

> [Dynamic] reserves the right, in its sole and absolute discretion, to either (i) initiate arbitration of any Other Claim or unresolved dispute[2] with [Baker Hughes] in Saudi Arabia, and/or (ii) to require [Baker Hughes] to arbitrate any such Other Claim or unresolved dispute in Saudi Arabia, in accordance with the terms of Attachment I to Schedule "E" hereof, in lieu of recourse to the DIFC LCIA arbitration provided in Schedule "E."

Baker Hughes argues, however, that Dynamic waived any right to demand arbitration in Saudi Arabia by demanding DIFC arbitration instead.

Should Dynamic not pursue *Saudi* arbitration, Schedule E provides an alternative dispute-resolution mechanism—namely, mediation and, failing that, arbitration under the DIFC-LCIA rules. Schedule E provides, in relevant part, as follows:

> *Provided that [Dynamic] has not elected to pursue resolution of a [Baker Hughes] Claim or Other Claim under Paragraph 20.4 of this Subcontract by arbitration in Saudi Arabia* in accordance with Attachment I to this Schedule "E", *any Other Claim arising out of or relating to this Subcontract* or any other agreements arising out of or relating to it, including but not limited to any question regarding its existence, formation, performance, interpretation, validity or termination, and which is not settled by agreement or otherwise fully and finally resolved between the Parties . . . *shall be referred to mediation in accordance with the Mediation Rules of the Dubai International Financial Center ("DIFC") London Court of International*

---

[2] The parties agree with one another that the instant dispute constitutes an "Other Claim," as defined in the subcontract, thus implicating Section 20.4.5.3.

No. 23-30827

*Arbitration ("LCIA") (the "Mediation Rules") from time to time in force . . . .*

Crucially, the section continues as follows:

*[I]f the dispute is not settled by mediation* within thirty (30) days of the commencement of the mediation, or such further period as the Parties shall agree in writing, *the dispute shall be referred by either Party to and finally resolved by arbitration under the Arbitration Rules of the DIFC LCIA (the "Rules") from time to time in force, which Rules are deemed to be incorporated by reference herein (save for Article 5.6 which is hereby expressly excluded).* The Seat, or legal place, of the arbitration shall be the DIFC, Dubai, United Arab Emirates.

The subcontract never mentions litigation as a means of dispute resolution.

**3.**

In September 2021, the government of Dubai issued Decree No. 34 (Decree 34), which replaced the DAI (and the DIFC's separate forum for maritime disputes—the Emirates Maritime Arbitration Centre) with the revamped Dubai International Arbitration Centre (DIAC).

Decree 34, by its express terms, "[a]bolished" the DAI and, in turn, the DIFC-LCIA.[3] The decree expressly stated, however, that DIFC-LCIA arbitration agreements executed before the effective date of Decree 34 are deemed valid, with the DIAC appointed to administer such proceedings. The Supreme Legis. Comm. in the Emirate of Dubai, Decree No. 34 Art. 6(a) (2021) [hereinafter Decree No. 34]. The

---

[3] Even though Decree 34 does not explicitly mention the DIFC-LCIA—and instead only refers to abolishing the DAI—the decree effectively closed the DIFC-LCIA: The DIFC-LCIA no longer commences and registers arbitrations.

decree further ordered that all arbitration tribunals currently before the DIFC-LCIA "will continue, without interruption, to consider and determine all arbitration claims pending with them, in accordance with the rules and procedures they adopt" but that the "DIAC and its administrative body w[ould] supervise processing these claims." *Id.* Art. 6(b). In furtherance of the DIFC's intended seamless transition, the decree transferred, *inter alia*, all assets, rights, and obligations of the DAI to the DIAC and did the same for the lists of DAI arbitrators, mediators, and experts. *Id.* Art. 5(a)(1), (2), (4).

Following the decree, the DIAC and LCIA executed an agreement clarifying the LCIA's role in pre-existing DIFC-LCIA arbitrations and issued an attendant press release reflecting the same. That agreement reflected that "the LCIA will administer all existing DIFC-LCIA cases (i.e. those commenced . . . on or before 20 March 2022)." The agreement and press release further stated that

> [a]ll arbitrations, mediations and other alternative dispute resolution proceedings referring to the respective rules of the DIFC-LCIA . . . commenced on or after 21 March 2022 . . . shall be registered by DIAC and administered directly by its administrative body in accordance with the respective rules of procedure of DIAC . . . unless otherwise agreed by the parties.

Consistent with the DIAC's official statement that all actions referring to the DIFC-LCIA rules commenced on or after March 21, 2022 shall henceforth be administered by the DIAC, the DIAC rules are very similar to those of the DIFC-LCIA. Among other things, they reflect similar requirements for the claim-and-answer process, the nominating and challenging of arbitrator appointments, and the rendering of awards.

**B.**

In March 2023, Baker Hughes sued several of Dynamic's affiliate entities—but not Dynamic itself—in Louisiana state court. The petition alleged that Dynamic's affiliates failed to pay Baker Hughes $1.355 million for the products, materials, and services that Baker Hughes provided toward the oil-and-gas project. The merits of that breach-of-contract action are not before us on appeal.

In April 2023, the defendants removed the case to the Eastern District of Louisiana. Then, in May 2023, the defendants, including the now-joined Dynamic, moved (i) to dismiss Baker Hughes's claims under the doctrine of *forum non conveniens* or (ii) in the alternative, to compel Baker Hughes to arbitrate its claims under Schedule E of the subcontract and to stay the litigation pending arbitration. Dynamic never demanded arbitration in Saudi Arabia or moved in the district court to compel arbitration in Saudi Arabia.

In November 2023, the district court denied Dynamic's motion in all respects. The district court held that the parties had agreed in the subcontract to arbitrate in the DIFC-LCIA and that Decree 34 abolished the DIFC-LCIA, rendering it unavailable as a forum for dispute resolution. Thus, the court held, the "forum-selection clause" in Schedule E was invalid and unenforceable, and the court was powerless to compel arbitration or to dismiss the case on the grounds of *forum non conveniens*. Dynamic appealed.

**II.**

This court generally reviews matters of contract interpretation de novo. *In re RE Palm Springs II, L.L.C.*, 106 F.4th 406, 418 (5th Cir. 2024). Thus, a district court's ruling on a motion to compel arbitration and to stay litigation pending arbitration is subject to de novo review. *Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236 (5th Cir. 2013); *Tittle v. Enron Corp.*, 463 F.3d 410, 417 (5th Cir. 2006). Likewise, this court reviews de novo

decisions involving the enforceability of forum-selection clauses for purposes of making *forum non conveniens* rulings. *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016); *Noble House, L.L.C. v. Certain Underwriters at Lloyd's, London*, 67 F.4th 243, 247 (5th Cir. 2023).

## III.

The New York Convention is an international treaty to which Saudi Arabia, the UAE, and the United States, among many other sovereign nations, are parties. The purpose of the New York Convention is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). The Federal Arbitration Act (FAA) codifies the New York Convention and provides for its enforcement in U.S. courts. 9 U.S.C. §§ 201 *et seq.*

The FAA provides that U.S. courts with jurisdiction under the FAA "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." *Id.* § 206. In applying the New York Convention, the Fifth Circuit "contemplates a very limited inquiry by courts when considering a motion to compel arbitration":

> [T]he court should compel arbitration if (1) there is an agreement in writing to arbitrate the dispute, (2) the agreement provides for arbitration in the territory of a Convention signatory, (3) the agreement arises out of a commercial legal relationship, and (4) a party to the agreement is not an American citizen.

*Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 273 (5th Cir. 2002). If these requirements are met, the New York Convention *requires* the

No. 23-30827

district court to order arbitration unless the agreement is "null and void, inoperative or incapable of being performed." *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex)*, 767 F.2d 1140, 1146 n.17 (5th Cir. 1985).

As a threshold matter, we agree with Baker Hughes that dismissal for *forum non conveniens* is the wrong vehicle where a party invokes the FAA to compel arbitration of a dispute currently in U.S. court. As Baker Hughes points out, neither the New York Convention nor the FAA mentions dismissal by national courts of arbitrable claims on the grounds of *forum non conveniens*; rather, they both describe compelling arbitration consistent with the terms of the arbitration agreement. 9 U.S.C. § 206. Indeed, the district court's only explanation for holding that *forum non conveniens* is the appropriate doctrine was to state that a motion to dismiss for *forum non conveniens* is "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W.D. of Tex.*, 571 U.S. 49, 60 (2013). But *Atlantic Marine* had nothing to do with arbitration.[4] And, in every case that we have located where a party invokes the FAA to move proceedings out of U.S. court, the court compels arbitration and stays proceedings. *See, e.g.*, *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 399 (5th Cir. 2006); *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1223 (11th Cir. 2000); *Dean v. Heritage Healthcare of Ridgeway, LLC*, 759 S.E.2d 727, 733–34 (S.C. 2014); *Astra Footwear Indus. v. Harwyn Int'l*,

---

[4] There is reason to believe that arbitration and litigation are fundamentally different in the context of orders that enforce a forum-selection clause. Under the FAA, courts can enforce arbitration agreements by compelling arbitration. But a court cannot compel foreign litigation *per se*—it can merely transfer, where appropriate, or dismiss. So when a forum-selection clause designates a foreign venue, dismissal is appropriate. Where a forum-selection clause designates an arbitral forum, however, the FAA directs courts to compel arbitration, as appropriate.

*Inc.*, 442 F. Supp. 907, 909–10 (S.D.N.Y.), *aff'd*, 578 F.2d 1366 (2d Cir. 1978); *Lewis v. UBS Fin. Servs. Inc.*, 818 F. Supp. 2d 1161, 1166 (N.D. Cal. 2011); *MoneyGram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, 05 Civ. 10773, 2006 WL 8461822, at *4–5 (S.D.N.Y. Nov. 9, 2006); *HZI Rsch. Ctr. v. Sun Instruments Japan Co.*, No. 94 CV. 2146, 1995 WL 562181, at *3–4 (S.D.N.Y. Sept. 20, 1995).

Thus, this dispute, properly conceived, is about a motion to compel. Below we consider whether the district court erred by denying Dynamic's motion to compel. To analyze the district court's decision, we consider three questions: (A) whether Schedule E stipulates a particular forum, the DIFC-LCIA, or only a set of rules, the DIFC-LCIA rules; (B) assuming Schedule E stipulates a particular forum—the DIFC-LCIA—whether that forum is available; and (C) assuming Schedule E stipulates a forum and that forum is unavailable, whether the district court erred by refusing to compel arbitration consistent with the valid terms of the subcontract.

## A.

The first question is further broken down into two sub-parts. First, does the text of Schedule E stipulate an arbitral forum or only the arbitral rules? And second, even if the text of Schedule E only stipulates the rules applicable to arbitration, does the parties' selection of rules associated with a particular institution impliedly select that institution as the forum?

### 1.

When reading an arbitration agreement, the court must employ the rules of contract construction to determine the objective intent of the parties. *Harvey v. Joyce*, 199 F.3d 790, 793 (5th Cir. 2000) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). This court has read the FAA to "establish[] that, as a matter of federal law," "whether the problem at hand is the construction of the contract language itself," "any

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

Here, the contested portion of Schedule E—which governs dispute resolution in the event Dynamic elects not to arbitrate in Saudi Arabia—reads as follows:

> *[I]f the dispute is not settled by mediation . . . the dispute shall be referred by either Party to and finally resolved by arbitration under the Arbitration Rules of the DIFC LCIA (the "Rules")* from time to time in force, which Rules are deemed to be incorporated by reference herein (save for Article 5.6 which is hereby expressly excluded).

The district court, without engaging in an analysis of the language in Schedule E, treated this provision as a forum-selection clause. We disagree that this language explicitly operates as a forum-selection clause.

The key question is this: What object does "to" modify in the italicized section above—"arbitration" or "the DIFC LCIA"? If it's the former, then Dynamic is correct: The parties intended to refer Schedule E disputes to arbitration under the DIFC-LCIA rules without specifying a particular forum. If it's the latter, then Baker Hughes is right: The parties intended to refer Schedule E disputes to the DIFC-LCIA. We find Dynamic's reading more persuasive under the plain text of Schedule E.

*First*, Baker Hughes's reading requires some serious acrobatics. You have to conclude that the preposition "to" leaps over two nouns and three more prepositions to reach its final destination, the object, "the DIFC LCIA." The bulleted text below uses commas to illustrate each party's respective construction of the disputed provision. In so doing, it also illustrates how Dynamic's reading is far more natural—and Baker Hughes's more strained.

- **Actual text:**
  - [I]f the dispute is not settled by mediation . . . the dispute shall be referred by either Party to and finally resolved by arbitration under the Arbitration Rules of the DIFC LCIA (the "Rules") from time to time in force . . . .

- **Dynamic's reading (commas added):**
  - [I]f the dispute is not settled by mediation . . . the dispute shall be referred by either Party to, and finally resolved by, arbitration under the Arbitration Rules of the DIFC LCIA (the "Rules") from time to time in force . . . .

- **Baker Hughes's reading (commas added):**
  - If the dispute is not settled by mediation . . . the dispute shall be referred by either party to, and finally resolved by arbitration under the Arbitration Rules of, the DIFC LCIA (the "Rules") from time to time in force . . . .

*Second*, Baker Hughes's reading asks the court to split open a defined term. Schedule E sections off the entire, capitalized phrase "the Arbitration Rules of the DIFC LCIA" as one defined term: the "Rules." Yet Baker Hughes urges that "to" modifies only half of the defined term. Again, see the above bullets to observe the implausibility of this construction. To underscore further why this reading is wrong, consider that a defined shorthand term can theoretically replace its longer form anywhere the longer form appears in a contract. If we did that here, it would make perfect sense, while completely ruining Baker Hughes's reading: "[T]he dispute shall be referred by either Party to and finally resolved by arbitration under [the Rules] from time to time in force . . . ."

*Third*, the words that follow "DIFC LCIA" further undermine Baker Hughes's reading. Let's assume for a moment that, like in the above bullets,

commas existed in Schedule E clarifying Baker Hughes's position. The sentence *still* would make no sense given what follows. See below:

> If the dispute is not settled by mediation . . . the dispute shall be referred by either party to, and finally resolved by arbitration under the Arbitration Rules of, the DIFC LCIA (the "Rules") from time to time in force, which Rules are deemed to be incorporated by reference herein (save for Article 5.6 which is hereby expressly excluded).

The arbitral institution "DIFC LCIA" isn't "from time to time in force"—its rules are. So "the DIFC LCIA" cannot be the object of the first clause any more than it's the subject of the second clause. Baker Hughes's construction fails yet again.

Even setting aside the tortured construction required to reach Baker Hughes's desired outcome, other indicia reflect that Schedule E sets only the rules of arbitration and not the forum. Courts have explained that words like "administered by" signal a clear intent to designate a forum, whereas words like "in accordance with" signal only an intent to set the rules. *Dean*, 759 S.E.2d at 733–34. Here, the language states that disputes shall be "referred by either Party to and finally resolved by arbitration *under the Arbitration Rules* of the DIFC LCIA." Thus, the words "under the Arbitration Rules" appear, whereas "administered by" do not. Indeed, if the parties wanted to establish the DIFC-LCIA as the exclusive forum for resolving Schedule E disputes, there are countless ways they could have done so. *See Reddam v. KPMG LLP*, 457 F.3d 1054, 1059 (9th Cir. 2006), *abrogated on other grounds by Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007). Instead, the parties drafted Schedule E in such a way that it appears on its face to have designated only the rules and not the forum.

Granted, Schedule A of the subcontract mentions Schedule E arbitration in a way that suggests the parties at least contemplated the

prospect of arbitrating before the DIFC-LCIA. Namely, Schedule A states that Baker Hughes "shall have no right to institute arbitration proceedings at the DIFC LCIA in Dubai ( in lieu of Saudi Arabia) . . . unless and until [Dynamic] has consented thereto, but shall be required to participate in all such proceedings if initiated by [Dynamic]." This language does not invalidate our conclusion that the plain text of Schedule E designates only the rules and not an exclusive forum—at most, it renders that conclusion slightly less certain. The phrase "at the DIFC LCIA in Dubai" does appear to contemplate arbitration administered by the DIFC-LCIA, but nowhere does it state that this is the *only* forum that is agreeable for or capable of hearing Schedule E disputes. If it were self-evident from the DIFC-LCIA rules that the DIFC-LCIA is the only forum capable of applying its rules, that would suggest that the parties intended for the DIFC-LCIA to administer any Schedule E dispute. But the record does not conclusively establish that the DIFC-LCIA is the only forum capable of applying these rules. And the plain text of Schedule E—the actual provision that governs this path for arbitration—indicates that the parties selected only the rules and not the forum. So Schedule A's references to the DIFC-LCIA at most cast Schedule E as ambiguous. And this court has held that any ambiguities in construing an arbitration agreement should be resolved in favor of arbitration. *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir.), *opinion supplemented on denial of reh'g*, 303 F.3d 570 (5th Cir. 2002).

Finally, both the district court and Baker Hughes rely on *Ranzy v. Tijerina* to show that Schedule E designates a forum. 393 F. App'x 174, 175 (5th Cir. 2010) (per curiam). But that case is inapposite. In *Ranzy*, the parties agreed that all disputes "shall be resolved by binding . . . arbitration by and under the Code of Procedure of the National Arbitration Forum." *Id.* (emphasis omitted). That sentence construction is completely different from the one here. But in any case, the *Ranzy* court never had to decide whether

No. 23-30827

this disputed provision designates only the rules as opposed to the forum because the agreement later stipulated that "all claims shall be filed at any NAF office." *Id.* (emphasis omitted). That provision clarifies that actions must be initiated with the NAF, not merely in accordance with NAF rules. No such language exists in Schedule E, so *Ranzy* is inapposite.[5]

For each of these reasons, Baker Hughes's reading is too clever by half. In fact, Baker Hughes throughout its briefing uses ellipses to omit the many interim words that undermine its construction, as follows: "shall be referred by either Party to . . . the DIFC LCIA." Additionally, Baker Hughes repeatedly omits from its quotation all of the language that follows the above-quoted language. Namely, it leaves out—without mention or ellipses—the subsequent parenthetical defining "the Arbitration Rules of the DIFC LCIA" as the "Rules" and the clause that comes after, for which "the Rules" is the subject. Finally, Baker Hughes takes for granted that "to" should modify "the DIFC LCIA" rather than "arbitration"; nowhere does Baker Hughes engage in the syntactical analysis to explain why.

To summarize, the text of Schedule E designates only a set of rules and not a particular arbitral forum.[6]

---

[5] Granted, the parties here agreed to apply the DIFC-LCIA rules, and those rules set forth procedures for, *inter alia*, filing with the DIFC-LCIA's registrar. But here, unlike in *Ranzy*, it is not clear that the parties intended to foreclose the possibility of another forum applying the DIFC-LCIA rules, even if we were to assume that the parties incorporated by reference the DIFC-LCIA rules into their agreement.

[6] It is worth noting that Dynamic *does* argue that Schedule E identifies a forum—just not in the specific sentence from Schedule E outlined above. Specifically, Dynamic argues that the very next sentence in Schedule E—"The Seat, or legal place, of the arbitration shall be the DIFC, Dubai, United Arab Emirates"—sets the forum as the DIFC. Baker Hughes correctly notes, however, that "[t]he designation of the 'seat' of arbitration does not identify the arbitration organization to which a dispute must be submitted" but instead refers to the "jurisdiction in which an arbitration takes place legally," i.e., the

**2.**

Even if the text of Schedule E only designates the set of rules applicable to the parties' arbitration rather than the forum, there is a separate question of whether parties *implicitly* selected a forum by designating that forum's rules. Every circuit court to have addressed this issue has held in the affirmative, but we have lingering doubts—doubts we need not resolve in this appeal.

Courts have held that a clause adopting the rules of a specific institution implicitly selects that institution as a—or the—forum.[7] *Smith Barney, Inc. v. Critical Health Sys. of N.C., Inc.*, 212 F.3d 858, 860–61 (4th Cir. 2000); *In re Salomon Inc. S'holders' Derivative Litig.*, 68 F.3d 554, 557–58 (2d Cir. 1995); *PaineWebber, Inc. v. Rutherford*, 903 F.2d 106, 108 (2d Cir. 1990); *see Brown*, 211 F.3d at 1222; *Luckie v. Smith Barney, Harris Upham & Co.*, 999 F.2d 509, 510–11, 513–14 (11th Cir. 1993) (per curiam).

In *Rutherford*, for instance, the Second Circuit held that there was no significant distinction between an agreement that provided for arbitration "only before" specified fora and an agreement that provided for arbitration "in accordance with the rules" of several such fora. 903 F.2d at 108. The court found, without explanation, that in both situations the language should be construed as an agreement to arbitrate only before one of the enumerated fora, thus precluding arbitration before a non-enumerated forum. *Id.*; *accord Salomon*, 68 F.3d at 558.

---

"courts with supervisory jurisdiction over the arbitration." Designation of the seat does not mean designation of the forum.

[7] Even if language that adopts the rules of a specific institution impliedly selects that institution as the forum, that does not automatically mean that the institution is the exclusive forum. *See* Section III.C.1 *infra*.

No. 23-30827

The Fourth Circuit held similarly in *Critical Health*. There, the arbitration provision stated that "[a]ny controversy arising out of or relating to any of my accounts . . . shall be settled by arbitration, in accordance with the rules then in effect of the NASD, or the Boards of Directors of the NYSE or the American Stock Exchange, Inc." *Critical Health*, 212 F.3d at 860 (second alteration in original). The court explained:

> The agreement specifies that arbitration may take place according to the rules of three [fora]. It does not mention any other organization and does not specifically provide for arbitration before the [American Arbitration Association ("AAA")]. Under the principle of *expressio unius est exclusio alterius*[,] arbitration is limited to the three prescribed fora.

*Id.* at 861. The Fourth Circuit thus reasoned that where an arbitration agreement names a particular forum, or several, it intends to exclude other fora.

In *Brown*, the Eleventh Circuit weighed in, albeit implicitly. There, the parties' arbitration clause provided that "any dispute . . . shall be resolved by binding arbitration under the Code of Procedure of the National Arbitration Forum" (NAF). 211 F.3d at 1220. That clause does not by its text specify a forum; it merely stipulates that all disputes shall be resolved by arbitration under NAF rules. *See Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1351 (11th Cir. 2014) (holding that *Brown*'s arbitration clause "select[ed] . . . just the rules of procedure" and not the arbitral forum). Yet *Brown* implicitly concluded that a clause adopting the rules of a specific institution implicitly selects that institution as a—or the—forum.[8] *See* 211 F.3d at 1222 (calling the NAF the "specified forum").

_____

[8] By all accounts, the issue of whether the arbitration clause in *Brown* stipulated only the rules as opposed to the forum was not briefed before or explored in any depth by

No. 23-30827

Other circuits, however, have cast doubt on this precept. *See Reddam*, 457 F.3d at 1059. In *Reddam*, the arbitration agreement, like the one here, "select[ed] the rules of the [forum], but d[id] *not* state that the arbitration [wa]s to take place before the [forum] itself." *Id.* "Had the latter been intended," the Ninth Circuit explained, "the parties could easily have said so." *Id.* Nonetheless, the Ninth Circuit acknowledged that some courts, such as those in the above-mentioned cases, have concluded that selecting a forum's rules implicitly designates that forum too. *Id.* at 1060. Without "decid[ing] whether the provision at issue was a choice of forum clause," but assuming so for the sake of its analysis, the Ninth Circuit continued to analyze whether the parties could arbitrate under the contract's terms. *Id.*

We do the same. While the Second, Fourth, and Eleventh Circuits may be correct to embrace the implied forum-selection clause approach, we—like the Ninth Circuit—have lingering doubts about adopting a blanket rule that any designation of arbitral rules necessarily means selection of a forum. After all, depending on the content of the rules in question, a rules-selection clause may be more properly conceived of as a choice-of-law provision rather than a forum-selection clause. *Compare Salomon*, 68 F.3d at 558, *with id.* at 559. And the extent to which it is appropriate to apply the canon of *expressio unius est exclusio alterius* depends, at least in part, on how readily a particular forum's rules may be applied by other fora.

However, we need not decide the issue of whether the parties' selection of a forum's rules necessarily means selection of that forum because we hold in Section III.C *infra* that the forum-selection clause—assuming it is

---

the *Brown* panel. So, even if *Brown* were a Fifth Circuit opinion, it would not be entitled to rule-of-orderliness precedential effect: "[T]he rule of orderliness applies where (1) a party raises an issue and (2) a panel gives that issue reasoned consideration." *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) (emphasis and footnote omitted).

No. 23-30827

one—is in any event not integral to the subcontract, and reverse and remand on that basis alone.

## B.

Assuming without deciding that the parties indeed selected the DIFC-LCIA as the forum for Schedule E disputes, we must then ask whether this forum is available in light of Decree 34.

The caselaw does not definitively resolve this question. In many cases, the arbitral forum, unlike the one here, indisputably disappeared, leaving no successor. *See, e.g.*, *Ranzy*, 393 F. App'x at 175 n.1 ("In July 2009, the NAF ceased consumer arbitrations under a settlement with the State of Minnesota."). In others, the designated forum clearly existed, but it was allegedly impracticable to submit the case to arbitration there for one reason or another.[9] The only cases that we have located where an arbitral forum went defunct, leaving affiliates, held that the designated forum *was* technically unavailable, but both cases ultimately compelled arbitration in the affiliate forum. *Lewis*, 818 F. Supp. 2d at 1166 (when designated forum went defunct, court compelled arbitration in its successor); *Const. Reinsurance Corp. v. Republic W. Ins. Co.*, No. 98 Civ. 7208, 1999 WL 126462, at *2

---

[9] *See, e.g.*, *Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 333–34 (5th Cir. 1987) (Iran was allegedly unavailable because it was too dangerous after the hostage crisis); *Inetianbor*, 768 F.3d at 1353–54 (contract required arbitration by Cheyenne River Sioux Tribe, whose dispute-resolution system did not authorize arbitration); *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 227–30 (3d Cir. 2018) (same); *Parm v. Nat'l Bank of Cal., N.A.*, No. 14-CV-0320, 2015 WL 11605748, at *9 (N.D. Ga. May 20, 2015) (where the sole agreed-upon rules did not exist, arbitration could not be compelled), *aff'd*, 835 F.3d 1331 (11th Cir. 2016); *Reed v. Johnson*, No. 14-CV-176, 2016 WL 913232, at *4 (N.D. Miss. Mar. 9, 2016) (dispute about whether the chosen forum, the AAA, would accept this particular type of action—one between patients and healthcare service providers); *Figueredo-Chavez v. RCI Hosp. Holdings, Inc.*, 574 F. Supp. 3d 1167, 1172 (S.D. Fla. 2021) (one party failed to pay AAA fees, making that forum unavailable).

No. 23-30827

(S.D.N.Y. Mar. 10, 1999) (when designated forum went defunct, its umbrella organization remained active and capable of receiving arbitrations).

Here, the core dispute is novel, at least in this circuit: whether a designated forum remains available where a functionally identical successor forum exists.[10] Recall that Decree 34, by its very terms, "abolished" the DAI, which administered the DIFC-LCIA. That seems like strong evidence that the forum no longer exists. But the counter-argument is far from frivolous. The DIFC-LCIA's successor institution, the DIAC, is functionally identical to its predecessor in many key respects. The DIAC's rules, for instance, mirror those of the DIFC-LCIA: They reflect nearly identical requirements for the claim-and-defense process, the nominating and challenging of arbitrator appointments, and the rendering of awards—basically any issue of import when prosecuting an arbitration. Moreover, the DIFC-LCIA's "access to the LCIA's eminent and experienced stable of arbitrators, mediators and experts" appears unchanged: The DAI transferred to the DIAC its lists of arbitrators, mediators, and experts. Decree No. 34, *supra*, Art. 5(a)(2), (4).

Indeed, the new regime arguably permits arbitration consistent with the old regime. The new forum provides that all arbitrations "referring to the respective rules of the DIFC-LCIA . . . commenced on or after 21 March 2022 . . . shall be registered by DIAC and administered directly by its administrative body in accordance with the respective rules of procedure of

---

[10] Dynamic also argues that, if Schedule E contains a valid forum-selection clause, that clause is entitled to a presumption of enforceability that may be overcome only upon Baker Hughes's demonstration that compelling arbitration in that forum is unreasonable under the circumstances. *Weber*, 811 F.3d at 773. That may be, but Baker Hughes is not arguing that even if the DIFC-LCIA is available, it would be unreasonable to compel arbitration there. Rather, it is arguing that the DIFC-LCIA is unavailable. Accordingly, that is the argument that we address.

DIAC . . . *unless otherwise agreed by the parties*." One interpretation of these provisions is that the parties here can agree to have their DIFC-LCIA cases registered with the LCIA to apply DIFC-LCIA rules. If that is true, it would obviate Baker Hughes's concerns about losing the name-brand and supervisory functions of the LCIA by submitting its case to the successor forum.

Again, however, we need not decide whether the DIFC-LCIA is unavailable as a forum because we conclude in Section III.C *infra* that any forum-selection clause designating the DIFC-LCIA is not integral to the parties' subcontract.

## C.

Even assuming that the parties impliedly designated the DIFC-LCIA as the proper arbitral forum, and that said forum is unavailable, the district court should have considered whether the parties' intent was to arbitrate generally or instead set an exclusive forum. *See, e.g.*, *Reddam*, 457 F.3d at 1060–61.

The FAA permits courts to compel arbitration but only "in the manner provided for in [an arbitration] agreement." *See* 9 U.S.C. § 4. When the forum selected by the parties is unavailable, the court can appoint a substitute arbitrator, *id.* § 5, unless the forum-selection clause sets an exclusive forum and that clause is "integral" to the parties' arbitration agreement, *BP Expl. Libya Ltd. v. ExxonMobil Libya Ltd.*, 689 F.3d 481, 491 n.7 (5th Cir. 2012) (quoting *Ranzy*, 393 F. App'x at 176) (collecting cases). Thus, where the parties' dominant purpose was not to set an exclusive forum and instead was to arbitrate generally, courts will compel arbitration in an alternate forum. *Brown*, 211 F.3d at 1222; *Dean*, 759 S.E.2d at 733–34; *Astra Footwear*, 442 F. Supp. at 909–10; *Lewis*, 818 F. Supp. 2d at 1166; *MoneyGram*, 2006 WL 8461822, at *4–5; *HZI Rsch.*, 1995 WL 562181, at *3

No. 23-30827

("If the parties imperfectly or incorrectly designate the instrumentality through which arbitration should be effected, the court will enforce the contract by making an appropriate designation.").

As explained further below, it is clear that the DIFC-LCIA is not the exclusive forum contemplated under the subcontract. Nor is the forum-selection clause—to the extent it is one—integral to the subcontract, because the parties' dominant purpose was to arbitrate generally. Accordingly, the forum-selection clause (if it is one) is therefore severable from the rest of the subcontract, and the court can appoint a substitute arbitrator. For these reasons, the district court erred by refusing to compel arbitration consistent with the remaining, valid dispute-resolution provisions in the subcontract.

**1.**

The parties did not designate the DIFC-LCIA as the exclusive forum. Even assuming that the parties designated the DIFC-LCIA as *a* forum of arbitration—and even *the* forum for purposes of Schedule E—it was not the exclusive arbitral forum contemplated by the agreement as a whole. Section 20.4.5.3 of the subcontract empowers Dynamic to elect to arbitrate in Saudi Arabia any dispute arising out of the subcontract. Specifically, that provision provides that Dynamic retains the right

> in its sole and absolute discretion, to either (i) initiate arbitration of any Other Claim or unresolved dispute with [Baker Hughes] in Saudi Arabia, and/or (ii) to require [Baker Hughes] to arbitrate any such Other Claim or unresolved dispute in Saudi Arabia, in accordance with the terms of Attachment I to Schedule "E" hereof, in lieu of recourse to the DIFC LCIA arbitration provided in Schedule "E."

Hence, the parties designated multiple possible fora for arbitration. And courts may compel parties to arbitrate in front of any forum specifically listed

in an arbitration agreement. *See Luckie*, 999 F.2d at 513–14; *Salomon*, 68 F.3d at 558–59.

Baker Hughes's only argument to undermine Section 20 is that Dynamic waived any right to demand arbitration in Saudi Arabia by pursuing the DIFC-LCIA arbitration instead. But there is simply nothing in the text of Section 20.4.5.3 that suggests Dynamic waived its right to demand arbitration in Saudi Arabia. If anything, the language "in lieu of recourse to the DIFC LCIA arbitration" means that Dynamic waives any right to pursue Schedule E arbitration by demanding arbitration in Saudi Arabia—not *vice versa*. But even if Dynamic did initially waive its right to demand arbitration in Saudi Arabia by pursuing arbitration in the DIFC-LCIA, a court's ruling that the DIFC-LCIA is unavailable—as the district court did here—surely bears on whether Saudi Arabia remains a live option henceforth. In any event, the broader point here is clear: The DIFC-LCIA is not the exclusive forum contemplated in the subcontract.

## 2.

Even assuming that the parties implicitly designated the DIFC-LCIA as a forum, that designation is not integral to the subcontract; rather, their dominant purpose was to arbitrate generally.

An arbitrator designation is integral to the agreement only if the parties "unambiguously expressed their intent not to arbitrate their disputes in the event that the designated arbitral forum is unavailable." *Khan v. Dell, Inc.*, 669 F.3d 350, 354 (3d Cir. 2012); *MoneyGram*, 2006 WL 8461822, at *5. In other words, a court will decline to appoint a substitute arbitrator only if the parties' choice of forum is "so central to the arbitration agreement that the unavailability of that arbitrator [brings] the agreement to an end." *Reddam*, 457 F.3d at 1061. Where the parties' dominant purpose was to arbitrate generally, the designation of a particular forum is not integral to the

contract, and the forum-selection clause is severable from the rest of the contract. *See Brown*, 211 F.3d at 1222; *Dean*, 759 S.E.2d at 733–34; *Lewis*, 818 F. Supp. 2d at 1166; *MoneyGram*, 2006 WL 8461822, at *4–5. Any doubts in construing the parties' objective intent are resolved in favor of arbitration. *Harvey*, 199 F.3d at 793.

We revisit the Eleventh Circuit's decision in *Brown*. There, the arbitration agreement provided that "any dispute . . . shall be resolved by binding arbitration under the Code of Procedure of the National Arbitration Forum." *Brown*, 211 F.3d at 1220. The court—even having assumed that this clause "specified" the NAF as the forum—held that "there is no evidence that the choice of the NAF as the arbitration forum was an integral part of the agreement to arbitrate." *Id.* at 1222. That is presumably because courts require more than merely naming a forum; to determine whether a forum-selection clause is integral to a contract, they look for "pervasive references" to the "exclusive jurisdiction" of the designated forum, *MacDonald*, 883 F.3d at 232 (quoting *Parm*, 835 F.3d at 1338); *id.* at 232 n.13, or evidence that the parties "unambiguously expressed their intent not to arbitrate their disputes in the event that the designated arbitral forum is unavailable," *Khan*, 669 F.3d at 354. Neither exists here.

Here, the subcontract does not make pervasive references to the DIFC-LCIA, much less to its "exclusive jurisdiction." *Cf. MacDonald*, 883 F.3d at 232 n.13. In the entire subcontract, there are only two references to dispute resolution in the DIFC-LCIA—(1) a reference in Schedule E that is ambiguous at best in its alleged designation of the forum and (2) a reference in Schedule A to "the DIFC LCIA arbitration" option that in the same breath designates a *separate* forum for arbitration, with elevated status over the DIFC-LCIA. Nor does the subcontract ever state that the DIFC-LCIA is the sole body competent to apply the DIFC-LCIA rules. *Cf. MoneyGram*, 2006

WL 8461822, at *5. Simply put, Schedule E's forum-selection clause (if it is one) is not integral to the subcontract.[11]

In addition to the above-cited cases, numerous other courts have compelled arbitration, notwithstanding the nonavailability of the designated forum, where the agreement's primary purpose was to arbitrate. *See, e.g.*, *Astra Footwear*, 442 F. Supp. at 909–10; *Lewis*, 818 F. Supp. 2d at 1166; *Republic W. Ins. Co.*, 1999 WL 126462, at *2; *HZI Rsch.*, 1995 WL 562181, at *3 (collecting cases).

As an initial matter, clearly, the parties' dominant purpose was to arbitrate. The subcontract's two dispute-resolution provisions identify arbitration as the exclusive means of proceeding (failing mediation). And nowhere does the subcontract mention litigation.

In *Lewis*, moreover, the arbitration agreement provided that any disputes "*will be determined by arbitration* as authorized by the arbitration law of the state of New York" and that "[a]ny such arbitration will be conducted under the auspices and rules of The NASD, Inc." 818 F. Supp. 2d at 1164. After the parties executed the arbitration agreement, the NASD was consolidated with the NYSE and replaced by FINRA. The court held that, where an agreement designates a forum and its rules and that forum gets

---

[11] Note further that the subcontract contains a severability clause. That clause provides as follows: "Should any part of this Subcontract or any other agreements arising out of or relating to it be found null and void by force of law, such nullity shall not otherwise affect the validity of the arbitration provisions." This issue certainly supports the conclusion that, even assuming Schedule E's alleged forum-selection clause *was* inoperative, that should not render the entire dispute-resolution portion of the subcontract null and void. *See Brown*, 211 F.3d at 1222. But the existence of a severability clause is not issue-dispositive. As *MacDonald* explains, many courts have refused to compel arbitration where the designated forum is unavailable and the arbitration agreement contained a severability clause. 883 F.3d at 231–32 (collecting cases). This is because the dispositive question is integrality.

replaced by a successor, the court may compel arbitration in the successor institution. *Id.* at 1166 (collecting cases). That is almost exactly the situation here.

Similarly, in *Republic Western Insurance Co.*, the contract designated a branch of a broader institution as the exclusive forum for dispute resolution. 1999 WL 126462, at *1. The branch then dissolved. The court explained, however, that the dissolution of one branch of a broader institution should not render null and void the parties' broader agreement to arbitrate. *Id.* at *2. The court therefore compelled arbitration within the broader, umbrella institution—which continued to conduct its arbitrations simply under a different name—in accordance with the stipulated rules. *Id.*

Here, like in *Republic Western*, there was considerable overlap and continuity in management, resources, and rules as the designated forum transitioned to its successor. Likewise, as in *Lewis*, it is clear that the DIAC is a highly similar successor institution. In each of the respects listed in Section III.B *supra*, the DIAC mirrors its predecessor. Further, it is clear that all governing entities contemplate a seamless transition from the old regime to the new one. Decree 34 expressly stated that DIFC-LCIA arbitration agreements executed before the effective date of Decree 34 are deemed valid, with the DIAC appointed to administer such proceedings. DECREE NO. 34, *supra*, Art. 6. Moreover, the DIAC and LCIA jointly explained that, under the DIAC rules, all disputes "referring to the respective rules of the DIFC-LCIA . . . shall be registered by DIAC and administered directly by its administrative body in accordance with the respective rules of procedure of DIAC . . . unless otherwise agreed by the parties." And the DIAC further ordered that all arbitrations registered in the DIFC-LCIA—previously administered by the DAI—commenced on or after March 21, 2022 would henceforth be administered by the DIAC.

In sum, even if the subcontract designated the DIFC-LCIA as a forum for dispute resolution, it is not the exclusive forum contemplated by the agreement as a whole, and the forum-selection clause (if it is one) is not integral to the subcontract and can be severed. Because the parties' primary intent was to arbitrate generally, the district court is empowered to compel arbitration and to appoint a substitute arbitrator consistent with the parties' intent as manifested in the subcontract.

## IV.

Baker Hughes asks this court to strike all or parts of Dynamic's reply brief, arguing that in the reply brief, Dynamic introduces evidence not previously included in the record—namely, a letter between Dynamic's and Baker Hughes's counsel dated August 17, 2022—that concerns confidential settlement negotiations and goes beyond the scope of Baker Hughes's response in this appeal. Dynamic concedes that it introduced evidence not previously in the record in its reply brief, and requests that this court use its discretion to introduce the evidence, but disputes that the letter is confidential and outside the scope of Baker Hughes's response.

The panel need not decide whether the contested evidence is confidential or beyond the scope of Baker Hughes's response because "[g]enerally, we will not enlarge the record on appeal with evidence not before the district court." *Trinity Indus., Inc. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992). Moreover, we find it unnecessary to exercise our discretion to enlarge the record when the reasoning herein does not rely on the letter introduced in Dynamic's reply brief. *See United States v. Rudolph*, 103 F.4th 356, 362 (5th Cir. 2024) (acknowledging the court has discretion to admit evidence not previously in the record). Accordingly, the court will strike those portions of the reply brief that reference or reproduce the letter that

was not in the record. *See Downey v. Barry*, 517 F. App'x 247, 248 (5th Cir. 2013) (per curiam).[12]

## V.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

We instruct the district court on remand to consider whether the DIFC-LCIA rules can be applied by any other forum that may be available—including the LCIA, DIAC, or a forum in Saudi Arabia—consistent with the parties' objective intent. If so, we instruct the district court to compel arbitration in that forum. If not, we instruct the district court to consider whether to otherwise compel arbitration in Saudi Arabia pursuant to the terms of Schedule A.

Further, we GRANT IN PART and DENY IN PART Baker Hughes's motion to strike. We strike only those portions of Dynamic's reply brief that reference or reproduce the August 17, 2022 letter that was not in the record.

---

[12] While we recognize that "[j]udicial records are public records" that the public has a right to access, *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 416 (5th Cir. 2021), the letter at issue was not part of the record.