# United States Court of Appeals
# for the Fifth Circuit

———————

No. 24-30554

———————

United States Court of Appeals
Fifth Circuit

**FILED**
May 5, 2026

Lyle W. Cayce
Clerk

Jeremiah Hill,

*Plaintiff—Appellee*,

*versus*

Jackson Offshore Holdings, L.L.C.; Jackson Offshore
Operators, L.L.C.,

*Defendants—Appellants*.

————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CV-994

————————————————————

Before Richman, Willett, and Douglas, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

Jeremiah Hill, a seaman, was injured while working on an offshore supply vessel owned and operated by Jackson Offshore Holdings, L.L.C., and Jackson Offshore Operators, L.L.C. (collectively, Jackson Offshore). Hill and Jackson subsequently entered into a wage and benefits agreement that contained an arbitration clause. Hill later sued Jackson Offshore in district court. The defendants moved to compel arbitration and to stay court proceedings. The district court denied the motion without prejudice and permitted discovery regarding the agreement's enforceability. We vacate the

No. 24-30554

district court's order and compel arbitration because the agreement provides "that any dispute relating to the validity, interpretation, or application of this Agreement shall be submitted to the arbitrator for resolution," and Hill has not challenged the validity of this delegation clause.

## I

## A

Jackson Offshore own and operate a fleet of offshore supply vessels, including the M/V BLIZZARD.  Jeremiah Hill was employed as an able-bodied seaman assigned to work on board the BLIZZARD.  Hill alleges that in April 2023, he was injured while aboard the BLIZZARD when unsecured cargo crushed his leg.  His severe injuries required at least eight surgical procedures, a thirty-day stay in the hospital, and another thirty-day stay at an in-patient rehabilitation facility.

After Hill's injury, Jackson Offshore provided maintenance and cure benefits to Hill as required under general maritime law.[1]  Additionally, Jackson Offshore provided several supplemental benefits to Hill, including payment of his full net wages.  After learning that Hill would not have permanent housing upon finishing in-patient care, Jackson Offshore's CEO, Lee Jackson (Lee), rented and furnished an apartment for Hill near the hospital where he would receive out-patient care.  The company also provided for Hill's transportation.  Jackson Offshore contends that these supplemental benefits totaled more than $100,000 as of mid-August 2024.

---

[1] *See generally Davis v. Odeco, Inc.*, 18 F.3d 1237, 1245-46 (5th Cir. 1994) (explaining that "[m]aintenance and cure is a seaman's right under general maritime law to receive food and lodging (maintenance) and necessary medical services (cure) if he falls ill while in the service of a vessel"); *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 407-08 (2009) (same).

Throughout Hill's in-patient recovery, Lee frequently texted Hill to ask about his treatment and to offer Hill food and other necessities. Hill alleges that Lee visited him almost daily and would tell him during these visits that "Jackson Offshore was taking care of [Hill's] medical expenses and would provide ongoing financial support." However, Hill alleges that Lee also told him that if Hill retained an attorney, the company's financial assistance "would necessarily end," and he would be "cut off." Hill asserts that Lee's visits and warnings continued "repeatedly and regularly" after he moved into the company-provided apartment in June 2023.

**B**

Approximately six months after Hill's injury, Lee and Jay Harkness, Jackson Offshore's CFO, visited Hill at the apartment in October 2023 and presented him with a document entitled Advance Wage and Benefits Agreement (Agreement). Under the Agreement, Jackson Offshore would extend Hill's supplemental benefits in exchange for Hill's agreement to arbitrate any claims he might have against the company.

The Agreement begins by stating that "the law requires the Company to provide maintenance and cure benefits" to Hill until he has "reached maximum medical improvement" or until Hill is "found to be fit for duty," and that "the Company will do so even if I do not sign this Agreement." Then, the Agreement states that if Hill "enter[s] into this Agreement, in addition to paying the required maintenance and cure benefits, the Company will also provide" the supplemental benefits it had been providing to Hill over the previous six months. The Agreement expressly notes that these supplemental benefits are to be "over and above maintenance of $50/day," and clarifies that the supplemental benefits are to "be treated as advances against any settlement, arbitration award or judgment."

The bolded arbitration provision then states:

> I [Hill] am not giving up my right to bring any claims against the Company for my injuries or illness. However, in exchange for the Company's Agreement to provide these additional benefits, I agree that if I choose to file a claim or lawsuit against the Company, its vessels or its employees arising under my employment, my injuries, the Jones Act, the general maritime law, any other applicable law or this Agreement, I will submit any such claims to binding arbitration . . . .

Following this provision is a delegation clause, which provides that "any dispute relating to the validity, interpretation, or application of this Agreement shall be submitted to the arbitrator for resolution."

The second page of the Agreement enumerates eight statements, preceded by bolded instructions to read the statements carefully. The statements confirmed that "I am waiving my right to have my claim decided by a jury"; "[m]y claim will be decided by an arbitrator"; "I understand that I am not obligated to sign this agreement and that I will continue to receive $50.00 per day as maintenance and that my medical bills relating to my injuries will be paid . . . even if I don't sign this agreement"; "I have been given the opportunity to consult with an attorney of my own choosing before signing this agreement"; "[t]here has been no coercion used to make me sign this agreement"; and "I have signed this agreement knowingly and willingly."

Hill signed the Agreement, confirming that he read it "from beginning to end" and had received an opportunity to consult with an attorney but did not do so. Hill now alleges that when Lee and Harkness presented the Agreement, Hill "requested, and was denied, time to review and consider whether to sign the Agreement." Hill asserts that when he asked questions about the Agreement, "Lee would just read the Agreement." According to Hill, he "specifically questioned the statements that [he] had the opportunity to consult with an attorney because [Lee] had repeatedly told [Hill] that if

[Hill] retained an attorney, the financial assistance would end." Hill alleges that in response to his questions, "Lee's face tensed, but he would not leave or allow [Hill] to take time to review the Agreement." Hill contends that no one ever explained to him his "rights to maintenance and cure," his rights under the Jones Act[2] and general maritime law, or the meaning of "arbitration." Hill asserts that he ultimately signed the Agreement because he "feared" that if he did not, then Jackson Offshore's "financial support, including maintenance and cure benefits, would terminate and he would be rendered homeless during the remainder of his recuperation."

Although Jackson Offshore did not offer evidence regarding the visit to Hill's apartment to consummate the agreement, Jackson Offshore asserts in this court that it made this choice to avoid potentially "waiving its rights under the delegation clause." Hill does not allege that Jackson Offshore reduced Hill's benefits or otherwise breached the Agreement after Hill signed it.

## C

Hill sued Jackson Offshore in federal district court, alleging negligence and unseaworthiness under general maritime law. Hill also sought a declaratory judgment that "the Agreement, including its arbitration provisions, [is] null and void" on four "non-exclusive" grounds. First, Hill alleged that his "consent to the Agreement was obtained through fraud" because Lee stated that if Hill consulted with an attorney, his benefits would cease. Second, Hill alleged that he was "fraudulently induced into signing the Agreement based upon the aforementioned statements" by Lee, as well as Hill's own "belief that he had to sign the Agreement in order to continue receiving benefits, including maintenance and cure benefits." Third, Hill

---

[2] 46 U.S.C. § 30104.

alleged that he "was under constant financial duress and fear that he would become destitute and homeless should he consult with an attorney." Fourth, Hill suggested that the medication he took to treat his injuries were "mind-altering" and "vitiated" his consent to the Agreement.

Citing the Agreement, Jackson Offshore moved to compel arbitration and to stay district court proceedings pursuant to 9 U.S.C. §§ 3-4. Jackson Offshore argued that the delegation clause required arbitrating Hill's "preliminary arguments" about fraudulent inducement and duress, and that the severability principle supported compelling arbitration because Hill challenged the validity of the whole Agreement rather than the delegation clause specifically.[3]

The district court denied Jackson Offshore's motion without prejudice, expressly permitting Jackson Offshore to "move anew" at a later point. The court reasoned that whether "the parties have a valid and enforceable agreement to arbitrate" is "an issue that" the district court "must decide." Explaining that Hill's allegations "render[ed] it plausible" that his consent to the Agreement had been "vitiated," the court permitted "discovery limited to the issue of the enforceability of the arbitration agreement." Further, the court rejected Jackson Offshore's severability argument because the court was "not persuaded that Hill has challenged only the Agreement as a whole without also challenging the delegation clause." Jackson Offshore timely appealed.

---

[3] *See generally Coinbase, Inc. v. Suski* (*Coinbase 2024*), 602 U.S. 143, 150 (2024) ("Under the severability principle, 'an arbitration [or delegation] provision is severable from the remainder of the contract,' and 'unless the challenge is to the arbitration [or delegation] clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.'" (alterations in original) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006))).

## II

Hill first argues that we do not have jurisdiction because the district court denied Jackson Offshore's motion *without* prejudice and "has not ruled" yet that the arbitration agreement "is invalid." We disagree.

The Federal Arbitration Act (FAA) permits interlocutory appeals from certain orders, including those "refusing a stay of any action under [9 U.S.C. § 3]" or "denying a petition under [9 U.S.C. § 4] to order arbitration to proceed."[4] Codified at 9 U.S.C. § 16(a), this provision "creates a rare statutory exception to the usual rule that parties may not appeal before final judgment."[5] "Notably, Congress provided for immediate interlocutory appeals of orders *denying*—but not of orders *granting*—motions to compel arbitration."[6] This choice "is consistent with Congress's purpose in the FAA 'to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.'"[7]

It appears we have not squarely addressed whether § 16(a) supports exercising jurisdiction when the district court entered its denial without prejudice and suggested it would later revisit the matter. However, we have

---

[4] 9 U.S.C. § 16(a)(1)(A)-(B); *see also Coinbase, Inc. v. Bielski* (*Coinbase 2023*), 599 U.S. 736, 740 (2023) ("[W]hen a district court denies a party's motion to compel arbitration, that party may take an interlocutory appeal.").

[5] *Coinbase 2023*, 599 U.S. at 740; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 627 (2009) ("The FAA, however, makes an exception to that finality requirement . . . .").

[6] *Coinbase 2023*, 599 U.S. at 740.

[7] *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)); *see also Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 880 n.7 (1994) ("[C]ourts must give full effect to this express congressional judgment that particular policies require that private rights be vindicable immediately . . . .").

No. 24-30554

exercised jurisdiction in very similar circumstances, after a district court refused to stay under § 3 and instead permitted "'limited discovery' into arbitrability."[8]  Although we did not expressly address whether the district court attached prejudice to its denial of the motion to stay in that case, the district court's order explicitly stated that there would be additional briefing on the motion to compel after the limited discovery.[9]  Moreover, other circuits have held that § 16(a) supports jurisdiction even when the district court enters its denial without prejudice or otherwise indicates an intent to later revisit the issue.[10]  The text of § 16(a) does not draw a distinction

---

[8] *Cameron Par. Recreation #6 v. Indian Harbor Ins. Co.*, 92 F.4th 1152, 1154 (5th Cir. 2024).

[9] *See Cameron Par. Recreation #6 v. Indian Harbor Ins. Co.*, No. 2:22-CV-05287, 2023 WL 2733538, at *1 (W.D. La. Mar. 1, 2023).

[10] *See, e.g.*, *Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 599 (3d Cir. 2020) ("We have jurisdiction over orders refusing to compel arbitration 'irrespective of the fact that the [motion] was denied without prejudice,' as well as orders entered where the 'district court does not feel itself ready to make a definitive decision on whether to order arbitration and therefore denies a motion to compel.'" (alteration in original) (citations omitted) (first quoting *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228 (3d Cir. 2012); and then quoting *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 103 (3d Cir. 2000))); *Griggs v. Kenworth of Montgomery, Inc.*, 775 F. App'x 608, 610-11 (11th Cir. 2019) ("The text of the FAA provision establishing our jurisdiction does not distinguish between denials with and without prejudice."); *Chorley Enters., Inc. v. Dickey's Barbeque Rests., Inc.*, 807 F.3d 553, 562 (4th Cir. 2015) ("[T]he district court expressly 'denied' the motions to compel arbitration 'without prejudice.' . . . [T]hat is 'all that is necessary to grant us appellate jurisdiction in this case.'" (quoting *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 636 (4th Cir. 2002))); *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 910-11 (8th Cir. 2010) (exercising jurisdiction even though the "district court denied the motion to compel arbitration 'without prejudice' and expressed its intent to preserve the status quo until it could hear argument"); *Microchip Tech. Inc. v. U.S. Philips Corp.*, 367 F.3d 1350, 1355 (Fed. Cir. 2004) ("[S]ection 16 allows for appeal of orders denying motions to compel arbitration even when the issue of arbitrability has not been finally decided."); *Boomer v. AT & T Corp.*, 309 F.3d 404, 411-13 (7th Cir. 2002) (holding that the fact "that the district court intended to reconsider the question of arbitrability . . . does not defeat this court's

between orders entered with prejudice and orders entered without prejudice.[11]  "Additionally, the fact that '[subsection 16(b)] provides a list of interlocutory arbitration-related orders that are *not* appealable' demonstrates that Congress intended what it said in subsection 16(a)—that a denial of the motion to compel arbitration is immediately appealable."[12]

We agree with the Third Circuit: "We have jurisdiction over orders refusing to compel arbitration 'irrespective of the fact that the [motion] was denied without prejudice.'"[13]  The record here unequivocally reflects that the district court entered an order denying Jackson Offshore's motion.[14]  This case does not present an appeal from "a purely ministerial order, serving housekeeping or docket management purposes."[15]  Nor does it involve an appeal from a discovery order that did not otherwise "formally deny" a motion.[16]

---

jurisdiction"); *see also Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 232-33 (1st Cir. 2023).

[11] *Cf. Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 627 (2009) ("By [§ 16(a)(1)(A)]'s clear and unambiguous terms, any litigant who asks for a stay under § 3 is entitled to an immediate appeal from denial of that motion—regardless of whether the litigant is in fact eligible for a stay.").

[12] *Boomer*, 309 F.3d at 413 (emphasis added) (citation omitted) (quoting *Sandvik*, 220 F.3d at 103); *see also Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1217 (10th Cir. 2005) (similar).

[13] *Bacon*, 959 F.3d at 599 (alteration in original) (quoting *Quilloin*, 673 F.3d at 228).

[14] *See Snowden*, 290 F.3d at 636.

[15] *Taylor v. Pilot Corp.*, 955 F.3d 572, 579 (6th Cir. 2020); *see also, e.g., Van Dusen v. Swift Transp. Co.*, 830 F.3d 893, 897 (9th Cir. 2016) ("One cannot construe a case management order designed to lead to a decision on a motion to compel arbitration as a decision to deny the motion."); *Salas v. GE Oil & Gas*, 857 F.3d 278, 280 (5th Cir. 2017).

[16] *Coleman v. Sys. One Holdings, LLC*, 117 F.4th 97, 100-01, 101 n.3 (3d Cir. 2024).

No. 24-30554

It is irrelevant that the district court "has not ruled that the Agreement is invalid," as Hill contends. Section 16 permits interlocutory appeals from orders denying a motion to compel arbitration or refusing to stay. Section 16's text imposes no requirement that the district court have ruled that the arbitration agreement is invalid.

Hill cites the Third Circuit's decision in *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,[17] but that decision supports the conclusion that we have jurisdiction. In *Guidotti*, the district court denied a motion to compel arbitration, concluding without any discovery that there was no valid arbitration agreement.[18] The Third Circuit vacated the district court's order to permit limited discovery.[19] The court expressly noted that it had jurisdiction under 9 U.S.C. § 16(a).[20] So, too, here. Hill's first argument therefore fails.

## III

"[A] district court's ruling on a motion to compel arbitration and to stay litigation pending arbitration is subject to de novo review."[21] "The district court's factual findings in support of such ruling are reviewed for clear error."[22]

Hill challenges the validity of the agreement he signed. He argues that notwithstanding that the agreement provides "any dispute relating to the

---

[17] 716 F.3d 764 (3d Cir. 2013).

[18] *Id.* at 767, 770-71.

[19] *Id.* at 780-81.

[20] *Id.* at 771 n.3.

[21] *Baker Hughes Saudi Arabia Co. v. Dynamic Indus., Inc.*, 126 F.4th 1073, 1079 (5th Cir. 2025); *see also Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016).

[22] *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018).

validity, interpretation, or application of this Agreement shall be submitted to the arbitrator for resolution," a court, not an arbitrator, should resolve his challenges to the agreement. The Supreme Court has addressed similar contentions more than once.

We begin with the Supreme Court's decision in *Rent–A–Center, West, Inc. v. Jackson*.[23] The Court said that a "delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement. We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."[24] The Supreme Court then explained that in determining whether *a delegation provision* is valid, "[t]here are two types of validity challenges under § 2."[25] Citing its earlier decision in *Buckeye Check Cashing, Inc. v. Cardena*,[26] the Court said "'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'"[27] The Supreme Court further explained this distinction: "In a line of cases neither party has asked us to overrule, we held that only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is

---

[23] 561 U.S. 63 (2010).

[24] *Id*. at 68.

[25] *Id.* at 70; *see also Lefoldt ex rel. Natchez Reg'l Med. Ctr. Liquidation Tr. v. Horne, L.L.P.*, 853 F.3d 804, 810 (5th Cir. 2017) (quoting *Rent–A–Ctr.*, 561 U.S. at 70).

[26] 546 U.S. 440 (2006)

[27] *Rent–A–Ctr.*, 561 U.S. at 70 (alteration in original) (quoting *Buckeye Check Cashing*, 546 U.S. at 444).

enforceable."[28]   The Court reasoned, "That is because § 2 states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained."[29]   The Supreme Court held, "Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."[30] "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."[31]

"But that agreements to arbitrate are severable does not mean that they are unassailable."[32]  "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4."[33]  The Court explained, "In *Prima Paint*, for example, if the claim had been 'fraud in the inducement of the arbitration clause itself,' then the court would have considered it."[34]

Accordingly, our court has held that if a party seeking arbitration points to a delegation clause that reserves contract validity questions for the arbitrator, then the opposing party's arguments contesting the validity of the

_____

[28] *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967); *Buckeye*, 546 U.S. at 444-46; *Preston v. Ferrer*, 552 U.S. 346, 353-54 (2008)).

[29] *Id.* (quoting 9 U.S.C. § 2).

[30] *Id.*; *see also Lopez v. Cintas Corp.*, 47 F.4th 428, 433 (5th Cir. 2022).

[31] *Rent–A–Ctr.*, 561 U.S. at 70-71 (quoting *Buckeye*, 546 U.S. at 445); *see also Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018).

[32] *Rent–A–Ctr.*, 561 U.S. at 71.

[33] *Id.*

[34] *Id.* (citing *Prima Paint*, 388 U.S. at 403-04).

contract *as a whole* "go[] to the arbitrator."[35]  But "[i]f there is an agreement to arbitrate with a delegation clause, and absent a challenge to the delegation clause itself, we will consider that clause to be valid and compel arbitration."[36]  Although "this rule does not require that a party challenge *only* the arbitration or delegation provision," a "party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, not just the contract as a whole."[37]

While Hill's complaint alleged four grounds for declaring the Agreement null and void, his opposition to Jackson Offshore's motion to stay and to compel arbitration argued only that the Agreement "was obtained through fraud and/or while plaintiff was under economic duress."  The district court addressed only these two arguments, and Hill's brief in this court similarly repeats only these arguments, contending that he "was fraudulently induced into signing while under duress."  We address only these two arguments.

We consider whether Hill specifically challenged the precise arbitration agreement that Jackson Offshore asked the district court to enforce—the delegation clause—or whether Hill challenged the whole Agreement.  As noted, "absent a challenge to the delegation clause itself, we

---

[35] *Lopez*, 47 F.4th at 433.

[36] *Edwards*, 888 F.3d at 744.

[37] *Coinbase 2024*, 602 U.S. 143, 150-51 (2024); *see also Lopez*, 47 F.4th at 433-34; *Green Tree Servicing, L.L.C. v. House*, 890 F.3d 493, 504 (5th Cir. 2018).

will consider that clause to be valid and compel arbitration."[38]  We conclude that Hill did not specifically challenge the delegation clause itself.

We have addressed specificity in numerous cases.  For example, in *Brown v. Pacific Life Insurance Co.*,[39] we held that parties did not specifically challenge the severable arbitration agreement because their arguments did not "distinguish between their attacks on the validity of the [broader] agreements and the arbitration clauses themselves" but instead "assert[ed] only that they would not have entered into the [broader] agreements containing the arbitration clauses" had the other party not made alleged misrepresentations.[40]  In *Lefoldt ex rel. Natchez Regional Medical Center Liquidation Trust v. Horne, L.L.P.*,[41] we held that a party's challenge was not specific because it did "not explain how" the alleged invalidity "operates on the arbitration provision any differently than it operates on other provisions of the" broader agreement.[42]  In *Green Tree Servicing, L.L.C. v. House*,[43] we held that "blanket allegations of fraud fall well short of the specificity that *Rent–A–Center* requires."[44]  And in *Lopez v. Cintas Corp.*,[45] we held that although a party "frame[d] his argument as being solely about the arbitration provision, he offer[ed] no explanation for why his challenge—if successful—

---

[38] *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018).

[39] 462 F.3d 384 (5th Cir. 2006).

[40] *Id.* at 397.

[41] 853 F.3d 804 (5th Cir. 2017).

[42] *Id.* at 817.

[43] 890 F.3d 493 (5th Cir. 2018).

[44] *Id.* at 504.

[45] 47 F.4th 428 (5th Cir. 2022).

would not render the entire contract [invalid]," meaning he "challenge[d] the validity of the contract, not just the arbitration agreement."[46]

To apply these principles here, it is helpful first to contextualize the parties' arguments. Hill conceptualizes the Agreement as a contract that "contains arbitration provisions, including a delegation clause." Hill's opposition in the district court was similar, stating: "Plaintiff contends that the Agreement is almost entirely comprised of the arbitration language at issue." The district court did not expressly address this apparent disagreement. While the court asserted that the Agreement's "singular purpose is to ensure that any legal action against Jackson Offshore related to the April 4, 2023[,] incident would be submitted to arbitration," the court also acknowledged that the Agreement ensured that Jackson Offshore's supplemental benefits would be treated as advances against any subsequent award to Hill. Because Hill assented to more than just arbitrating his claims, his characterization of the Agreement is more accurate.

Hill's opposition to Jackson Offshore's motion in the district court stated that he

> challenges both the entire Agreement, as well as the arbitration language or "clause" specifically, and submits that the Agreement is vitiated by the fraudulent statements of the owner of Jackson Offshore, Lee Jackson, and the economic duress brought on by Jackson Offshore under which Plaintiff lived at the time the Agreement was signed.

Despite framing his argument as challenging the "arbitration language"—which, it is worth noting, does not expressly differentiate the severable *delegation clause*—Hill's opposition never logically related any arguments

---

[46] *Id.* at 434.

specifically to the arbitration provision or delegation clause. For example, Hill never explained *how* he was fraudulently induced into agreeing to the delegation clause specifically or *how* economic duress compelled him to agree to that clause specifically. To the contrary, Hill's opposition repeatedly suggested "that the fraudulent representations by Mr. Lee and economic duress faced by Plaintiff vitiated his consent to the Agreement, invalidating the Agreement in its entirety." These arguments mirrored those in his complaint, which requested a declaration that "the Agreement, including its arbitration provisions, [is] null and void." Despite mentioning the plural "arbitration provisions," Hill did not specifically argue that the delegation clause was invalid; instead, he repeatedly stated that his "consent to the Agreement was" vitiated. Hill's arguments are of the same ilk as those in the numerous cases holding that a party did not specifically challenge the precise arbitration agreement at issue.

The Supreme Court made clear in *Rent–A–Center* that the party resisting arbitration must make arguments "specific to the delegation provision."[47] Hill must do more than simply argue "that the contract as a whole (including its arbitration provision) is rendered invalid,"[48] but he did not make any arguments beyond attacking the Agreement generally. When asked at oral argument what *specifically* Hill, Lee, and Harkness discussed about the arbitration clause and the delegation clause, Hill stated that "[t]hey did not have any in-depth discussion about any of the Agreement."

The district court, however, explained that it was "not persuaded that Hill has challenged only the Agreement as a whole without also challenging the delegation clause." The court offered two points in support. First, Hill's

---

[47] *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 73-74 (2010).

[48] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006).

opposition "expounded upon the nature of the challenge that Hill is bringing" by specifically mentioning the arbitration language. Second, the Supreme Court recently stated in *Coinbase, Inc. v. Suski* (*Coinbase 2024*)[49] that the severability principle "does not require that a party challenge *only* the arbitration or delegation provision. Rather, where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge."[50]

Neither point supports the district court's conclusion. First, even though Hill's opposition expressly stated that he challenged "both the entire Agreement, as well as the arbitration language or 'clause' specifically," Hill did not—as discussed above—explain *how* his challenges applied to the delegation clause specifically. His efforts to frame his challenge as directed at the delegation clause, without more, are insufficient.[51] Second, *Coinbase 2024* did not undermine the Court's instructions in *Rent–A–Center*.[52] Instead, *Coinbase 2024* "[a]ssum[ed] without deciding" that the severability principle applied to the argument in that case—that an arbitration agreement "no longer exist[ed]" because of an alleged superseding contract.[53] The Court, quoting *Rent–A–Center*, expressly observed that the party's challenge in the district court "was 'directed specifically to' the delegation provision."[54] As discussed above, Hill's arguments were not.

---

[49] 602 U.S. 143 (2024).

[50] *Id.* at 151 (quoting *Rent–A–Ctr.*, 561 U.S. at 71).

[51] *See Lopez*, 47 F.4th at 434.

[52] *See, e.g.*, *Modern Perfection, LLC v. Bank of Am., N.A.*, 126 F.4th 235, 243 (4th Cir. 2025) (relying on *Rent–A–Center*'s specificity guidance even after *Coinbase 2024*); *see also Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 321-22 (3d Cir. 2024) (similar).

[53] *Coinbase 2024*, 602 U.S. at 150-51, 151 n.*.

[54] *Id.* at 151 n.* (quoting *Rent–A–Ctr.*, 561 U.S. at 71).

No. 24-30554

\*      \*      \*

In sum, Hill's arguments, which raise validity or enforceability issues, challenge the Agreement as a whole, not the delegation clause specifically, so the severability principle commands that they be referred to an arbitrator. The district court erroneously denied Jackson Offshore's motion to compel arbitration and to stay proceedings.    We VACATE that order and REMAND for proceedings consistent with this opinion.

No. 24-30554

DON R. WILLETT, *Circuit Judge*, concurring:

Today's result flows—inexorably—from the Supreme Court's decision in *Rent–A–Center, West, Inc. v. Jackson*.[1] When parties unmistakably agree to delegate gateway questions to an arbitrator, courts must respect that choice unless the challenger specifically targets the delegation provision itself.[2] No such attack was made here. I therefore concur because the majority opinion does exactly what the law commands: it sends the parties to the forum they chose to resolve their gateway disputes. I write separately because one of our precedents has strayed from that rule.

In *Rent–A–Center*, addressing an arbitration agreement materially indistinguishable from this one, the Supreme Court prescribed a simple inquiry.[3] Courts examine *only* the provision the movant seeks to enforce—here, the delegation clause—and leave attacks on the broader contract to the arbitrator.[4] "[U]nless [a party] challenge[s] the delegation provision *specifically*, we must treat it as valid" and "leav[e] any challenge to the validity of the Agreement *as a whole* for the arbitrator."[5] That ends the judicial inquiry.

Our decision in *Kubala v. Supreme Production Services, Inc.* blurred that bright line, converting the Supreme Court's one-step into a Fifth Circuit two-step.[6] Instead of asking only whether the challenger specifically attacked the delegation clause—as *Rent–A–Center* requires—*Kubala* began with a

---

[1] 561 U.S. 63 (2010).

[2] *Id.* at 70–72.

[3] *Id.*

[4] *Id.* at 72.

[5] *Id.* (emphases added).

[6] 830 F.3d 199, 201–02 (5th Cir. 2016).

free-floating inquiry into whether the arbitration agreement as a whole was validly formed.[7] Only after that threshold "analysis of contract formation" to confirm "there [wa]s in fact a valid agreement" did *Kubala* proceed to "whether that agreement . . . contain[ed] a delegation clause."[8] That sequence does more than add a step. It puts the first question second and the second question first. And *Rent–A–Center* forbids exactly that.[9]

The downstream effects were predictable. Subsequent panels, applying *Kubala* as they must, have treated the delegation clause as an afterthought—even though the Supreme Court treated it as the decisive issue.[10] *Rent–A–Center* does not permit a preliminary examination of the broader agreement once the delegation clause is invoked and not specifically

---

[7] *Id.* at 202. Like many cases, *Kubala* blurs "formation" and "validity." My concurring colleague correctly notes that the two are distinct. But that distinction does no work here. *Rent–A–Center* makes clear that parties may delegate gateway issues of all sorts—arbitrability, enforceability, validity, formation, or existence—to the arbitrator. *See* 561 U.S. at 69. That *Rent–A–Center* happened to involve validity does not mean validity is the only gateway issue parties may delegate. *See id.* at 70. The Court's opinion speaks in broader terms, and nothing in it suggests that formation enjoys some special immunity from delegation. Indeed, the delegation clause in *Kubala* itself covered both formation and validity. *See* 830 F.3d at 204. So if a party wishes to resist arbitration on a delegated gateway issue, it must direct that challenge to the specific arbitration provision the movant seeks to enforce. *See* 9 U.S.C. § 2.

[8] 830 F.3d at 202.

[9] *See* 561 U.S. at 72 (directing courts to "leav[e] any challenge to the validity of the Agreement as a whole for the arbitrator" unless the delegation provision is specifically challenged and invalid).

[10] *E.g.*, *Aramark Servs., Inc. Grp. Health Plan v. Aetna Life Ins. Co.*, 162 F.4th 532, 537 (5th Cir. 2025); *Edwards v. DoorDash, Inc.*, 888 F.3d 738, 743–45 (5th Cir. 2019); *Matter of Willis*, 944 F.3d 577, 579–80 (5th Cir. 2019); *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550–51 (5th Cir. 2018); *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348–49 (5th Cir. 2017).

No. 24-30554

challenged.[11] What should be a straight path to arbitration has become a doctrinal detour.

To be sure, the rule of orderliness is a stern taskmaster. A three-judge panel cannot rewrite circuit precedent simply because it would have taken a different route.[12] But neither may a panel follow circuit precedent past the point where it collides with Supreme Court precedent: "Our job, as an inferior court, is to adhere strictly to Supreme Court precedent."[13] And "where a panel decision [i]s inconsistent with earlier Supreme Court precedent[,] . . . [t]he binding authority [i]s the earlier Supreme Court decision, not the later panel decision."[14] Hierarchy controls. Habit cannot.

This case presents no difficulty. The outcome is the same under either *Rent–A–Center* or *Kubala*, so the conflict does not affect today's judgment.

---

[11] My concurring colleague assigns significant weight to *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019), because the Court did not "chastis[e] us for conducting an initial contract existence analysis prior to submitting the matter to arbitration." But *Henry Schein* asked a different question entirely: whether there is any "wholly groundless" exception to delegated arbitrability. *Id.* at 65. The Court held there is not. *Id.* That holding says nothing about the sequencing issue presented here. *Henry Schein* decided the question before it. It did not silently decide this one, too. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (admonishing that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents" (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

[12] *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)).

[13] *United States v. Vargas*, 74 F.4th 673, 683 (5th Cir. 2023) (en banc).

[14] *Thompson v. Dallas City Att'y's Off.*, 913 F.3d 464, 467–68 & n.16 (5th Cir. 2019) (declining to follow circuit precedent that "couldn't be squared with prior Supreme Court precedent" (citing *Wilson v. Taylor*, 658 F.2d 1021, 1034–35 (5th Cir. 1991)).

But the conflict remains. My view is straightforward: *Kubala*'s extra step "is irreconcilable, and thus inoperative, and has been since it was decided."[15] Even when harmless in a given case, doctrinal drift warrants correction. Small deviations have a way of hardening into well-worn paths[16]—and *Kubala* appears to be one of them. That alone warrants course correction. The Supreme Court has already drawn the line. We should toe it.

_____

[15] *Id.* at 468.

[16] *See, e.g.*, Thomas W. Merrill, *The Story of* Chevron*: The Making of an Accidental Landmark*, 66 Admin. L. Rev. 253, 253 (2014) (explaining how "innovations" to which "no one pa[id] much attention" blossomed into "one of the most famous cases in administrative law"); Christine Basic, *Strict Scrutiny and the Sexual Revolution:* Frontiero v. Richardson, 14 J. Contemp. Legal Issues 117, 121 n.16, 128 (2003) (recounting correspondence between two Justices, in which one wrote: "The author of *Reed* [*v. Reed*, 404 U.S. 71 (1971),] never remotely contemplated such a broad concept [as 'suspect classification . . . strict scrutiny']. But then, a lot of people sire offspring unintended." (second alteration in original)).

No. 24-30554

DANA M. DOUGLAS, *Circuit Judge*, concurring:

Our court's precedent requires that we engage in a two-step inquiry to determine the arbitrability of an arbitration clause. I disagree that our circuit's precedent is so manifestly at odds with Supreme Court guidance in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), that it warrants rebuking our clear precedent. The concurring opinion is correct, however, in noting that our court's interpretation of *Rent-A-Center* does not affect the outcome of this case. Because Hill did not specifically challenge the delegation clause in his settlement agreement (the "Agreement") with Jackson Offshore Holdings, we cannot analyze the arbitrability of the contract. On this point, I agree with the majority opinion. Before holding that the question of arbitrability must be submitted to an arbitrator, however, the majority opinion should have confirmed that the parties had entered into the Agreement at all. If there were grounds to indicate that the Agreement never existed, such as if the contract were absolutely null under Louisiana law, then any disputes arising under the purported Agreement would not have to be sent to arbitration, despite the presence of a delegation clause that was not effectively challenged.

I

This court has clearly established that a two-step inquiry is necessary to determine whether a party may compel arbitration of a contract dispute. *See, e.g.*, *Edwards v. Doordash,* Inc., 888 F.3d 738 743–45 (5th Cir. 2019); *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550–51 (5th Cir. 2018); *Kubala v. Supreme Production Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "First, we consider whether [appellant] is challenging the formation of his contract with [appellee] or the validity of that contract. Second, we address the putative delegation provision." *Arnold*, 890 F.3d at 550 (providing that the court is only permitted to analyze challenges to formation—not validity). Thus, our

23

court did not ignore *Rent-A-Center*'s prohibition on judicial validity inquiries; rather it determined that a formation challenge is distinguishable from a validity challenge and, therefore, must be addressed before submitting a dispute to arbitration.

The first step in analyzing a delegation clause challenge is determining whether an arbitration agreement exists at all.[1]  As this court in *Kubala v. Supreme Production Services, Inc.* explained:

> [I]f the party seeking arbitration points to a purported delegation clause, the court's analysis is limited.  It performs the first step—an analysis of contract formation—as it always does.  But the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated.

830 F.3d at 202.  "Since *Kubala*, we have reiterated that the first step of the test is limited to contract formation." *Edwards*, 888 F.3d at 744.  Rather than contradicting *Rent-A-Center*, *Kubala* falls cleanly within its margins.  While the Supreme Court may later determine that *Rent-A-Center* cannot be applied in the manner our circuit has, the Supreme Court has yet to do so, even when given the opportunity.[2]  Our caselaw guides us to ignore our own precedent

---

[1] Supreme Court jurisprudence and the Federal Arbitration Act (FAA) alike reflect the principle that arbitration agreements are subject to standard principles of contract formation.  *See Rent-A-Center*, 561 U.S. at 67 (citing 9 U.S.C. § 2) ("The FAA reflects the fundamental principle that arbitration is a matter of contract."); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Just like any other contract, if a contract does not even exist, there is nothing for a court or an arbitrator to analyze or enforce.

[2] The Supreme Court considered our court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, in which the defendant-appellant challenged the contract as a whole but not the delegation provision, without chastising us for conducting an initial contract existence analysis prior to submitting the matter to arbitration.  *See* 586 U.S. 63,

No. 24-30554

only when it cannot "be squared with prior Supreme Court precedent," *Thompson v. Dallas City Att'y's Off.*, 913 F.3d 464, 468 (5th Cir. 2019), not when it falls into a set of circumstances the Supreme Court has yet to specifically address.

Absent clear guidance from the Supreme Court, our court is duty-bound to follow its own interpretation of *Rent-A-Center* pursuant to the rule of orderliness. *Barber v. Johnson*, 145 F.3d 234, 237 (5th Cir. 1998) ("Even if persuaded that [our prior precedent] is inconsistent with [Supreme Court precedent], we may not ignore the decision, for in this circuit one panel may not overrule the decision of a prior panel."); *United States v. Jones*, 88 F.4th 571, 573 (5th Cir. 2023) (per curiam) ("This court's rule of orderliness compels it to follow existing circuit precedent unless the Supreme Court unequivocally overrules it." (citation modified)). The tension that the concurring opinion perceives between our court's precedent and *Rent-A-Center* falls far short of justifying deviation from our court's settled interpretation. *Rent-A-Center* targets the validity portion of the inquiry (*i.e.*, our court's step two), holding that the severability principle dictates that a delegation provision must be treated as valid unless a party challenges the delegation provision specifically. 561 U.S. at 71. *Rent-A-Center* does not impinge on this court's ability to review the preliminary question of contract existence or formation (*i.e.*, our court's step one).

---

67–69 (2019). The Supreme Court expressly noted that the court should confirm the existence of an agreement before proceeding to arbitration pursuant to a putative delegation clause. *Id.* at 69. While the issue on appeal in *Henry Schein* involves the existence of a "wholly groundless" exception to the delegation of arbitrability, the Supreme Court clearly states, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id.*

## II

Proceeding to conduct the analysis that is required under our court's precedent, I ultimately reach the same conclusion as the majority opinion. At our court's step one, the issue is not whether the agreement is valid or enforceable. As discussed, the court should only consider the validity of the Agreement if it finds that the gateway issue of arbitrability has not been delegated to an arbitrator. The relevant question before our court at step one is thus whether the parties "entered into any arbitration agreement at all," an analysis of the agreement's existence rather than its validity. *Kubala*, 830 F.3d at 201 (emphasis omitted); *see also Arnold*, 890 F.3d at 550 ("In conducting [an] inquiry [into whether the parties formed an arbitration agreement], we distinguish between 'validity' or 'enforceability' challenges and 'formation' or 'existence' challenges."). This "formation" versus "validity" distinction is critical to the court's inquiry because the court "ha[s] authority and responsibility to decide the matter" when "the 'very existence of a contract containing the relevant arbitration agreement is called into question.'" *Arnold*, 890 F.3d at 550 (quoting *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (citation modified)).

On appeal, Hill argues that he "was fraudulently induced into signing [the Agreement] while under duress." Because our court's inquiry at step one requires us to determine whether Hill's arguments involve *validity or enforceability* issues or *formation or existence* challenges, we turn to the principles of contract formation to determine to which category fraud and duress claims belong.

Our court's precedent indicates, and the parties agree, that Louisiana law applies here. *Lopez v. Cintas Corp.*, 47 F.4th 428, 433 (5th Cir. 2022) (citing *Edwards*, 888 F.3d at 745) ("We look to state law to determine whether a challenge is about contract validity vs. contract existence."); *see*

*also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). A valid Louisiana contract requires four elements: "(1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose." *Provenza v. Cent. & Sw. Servs., Inc.*, 775 So. 2d 84, 89 (La. App. 2 Cir. 2000) (citing La. Civ. Code Ann. arts. 1918, 1927, 1966, 1971). Consent is perfected through offer and acceptance, La. Civ. Code Ann. art. 1927, and consent may be vitiated by "vices of consent," including error, fraud, or duress, *id*. art 1948; *see generally* Saul Litvinoff, *Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion*, 50 La. L. Rev. 1 (1989).

When any of the four requirements for contract formation have not been met, a contract is null. La. Civ. Code Ann. art. 2029. Louisiana law provides for two types of nullity: absolute nullity and relative nullity. *Id.* arts. 2030, 2031.[3] An absolutely null contract is void *ab initio*, whereas a relatively null contract is valid until the party for whose benefit the nullity exists exercises their right to nullify the contract. *See* La. Civ. Code Ann. arts. 2030, 2031; *see also* Litvinoff, *supra*. Generally, such party may bring an action for annulment within five years or raise nullity as a defense against an action on the contract at any time. La. Civ. Code Ann. art. 2032. Alternatively, a relatively null contract may be confirmed by the party on whose behalf the nullity exists, which cures the relative nullity. La. Civ. Code Ann. art. 2031.

---

[3] "A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." La. Civ. Code Ann. art. 2030. "A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made." *Id*. art 2031.

Hill argues that no contract was ever perfected between himself and Jackson Offshore due to fraud and economic duress—both of which are vices of consent that question whether he freely consented to the Agreement. A vice of consent creates a relative nullity that may be challenged in court but nevertheless does not undermine the very existence of the contract burdened by the vice of consent. *See* Litvinoff, *supra*, at 81–82. Thus, even if Hill is correct that the Agreement does not evidence his free consent, the contract is relatively null; a relatively null agreement "is deemed never to have existed only when it 'has been declared null by the court.'" *In re PetroQuest Energy, Inc.*, 54 F.4th 299, 306 (5th Cir. 2022) (quoting LA. CIV. CODE ANN. art. 2033). There is no indication here that the Agreement has been nullified by a court on these grounds; therefore, Hill has not effectively challenged the existence of the Agreement.

## III

Having determined, at our court's step one, that the Agreement exists, this case is thus halted by our court's step two. Because Hill did not challenge the delegation clause with specificity, the judicial inquiry ceases here. Accordingly, this case must be submitted to arbitration.